IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 3:06-CR-054-MEF |
| | ) | wo |
| SALLEY WHALEY HOGAN | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

On March 1, 2006, the United States indicted the defendant, Salley Whaley Hogan ("Hogan") under 18 U.S.C. §922(g)(1) as a felon found in possession of a firearm on November 23, 2004, in Chambers County, Alabama. Following an evidentiary hearing and careful consideration of all relevant evidence and arguments, the Magistrate Judge concludes that Hogan's *Motion to Suppress* (Doc. 14, July 13, 2006) should be DENIED pursuant to the factual findings and conclusions which follow.

I. EVIDENTIARY FACTS

Testimony from Sgt. Jerome Bailey, a veteran law enforcement officer employed for the past three years by the Lafayette Police Department ("Sgt. Bailey") provided material facts which are essentially undisputed. On November 23, 2004, Sgt. Bailey activated the blue lights on his patrol car to pull over a car he witnessed making a left turn, on a city street near the Lafayette Police Department, without giving a signal . Not contested is the legality of this traffic stop, which resulted in a "traffic violation warning" to the driver, Belinda Baxter Saylor, ("Saylor"), the only other witness at the evidentiary hearing.[1]

---

[1]Saylor testified: "[Sgt. Bailey] said that the blinker – I didn't turn the blinker on.
(continued...)

Sgt. Bailey "walked up to the driver of the vehicle and asked for driver license and proof of insurance" before reporting the traffic infraction which triggered the stop.[2] The officer observed a female passenger on the front seat and recognized her as the defendant from prior police-related contacts. He secured identification documents on the driver and passenger and "ran an NCIC computer check for warrants" which confirmed Hogan's status on probation in Chambers County.[3]

Sgt. Bailey made these additional observations which prompted his request to the driver for consent to search her car: "there was a dashboard on the passenger side that was open, there was two pill bottles in there and there were some pill bottles on the floor behind the driver's seat in the

---

[1](...continued)
And I know I did turn the blinker on, it just didn't work." *Tr.* 61: 2-3. According to Sgt. Bailey, when he advised Saylor why he stopped her, "she just said she didn't know if she gave a turn signal or not." *Tr.* 4:23-24. At the conclusion of oral arguments by defense counsel, the court inquired

> THE COURT: Let me ask you one question, counsel, just for clarification. Do you concede that there is no evidence contradicting the office's stated reason for stopping the vehicle? That is, that he stopped it because he did not see the driver signal her left turn?
>
> Ms. Freeman: Yes, I do concede that, Your Honor.

*Tr.* 73: 1-6

[2]Sgt. Bailey recalls his conversation with the driver occurring outside her door as she remained seated inside. Saylor insists that she got out of her car immediately and walked to the front or side of the patrol car for their conversation. For the legal issues raised on this suppression motion, the court deems this disputed fact immaterial.

[3]*Tr.*6-7. While assigned as a sheriff's narcotics investigator, Sgt. Bailey "executed search warrants at [Hogan's] residence up in Whaleyville, the north end of Chambers County... in the late 80s and early 90s." He knew that she had pled guilty to a state felony narcotics offense and knew that her conviction disqualified her from possession of any firearm. *Tr.* 9.

floorboard. . . It just looked suspicious for pill bottles to be laying on the floorboard like that." Additionally, he found "both subjects in the vehicle [acting] extremely nervous, and they was just acting suspicious to me. . . They had nervous conversations. Ms. Balinda, she was real jittery and stuff about the pill bottles."[4] In response to the officer's inquiry, Saylor described the pill bottles as her medication.[5] Sgt. Bailey had the driver exit the car "so [he] could write up the warning citation" and while standing in front of the patrol car, he also requested permission to search the vehicle. Saylor provided a voluntary consent for the requested search, and testified, "I gave him permission to search my car."[6] Sgt. Bailey then "asked [Saylor] were there any weapons in the car or on her person" and she "replied no."[7]

Only after securing written authorization to search the car did Sgt. Bailey engage Hogan in the interaction, summarized below in his direct examination, which resulted in the search and

---

[4]Pressed on cross-examination to explain his suspicion about the pill bottles, Sgt. Bailey emphasized that he did not verify that the pill bottles had prescription labels until he received consent to search the car, and noted:
> Being laying in the floorboard like they were, based on my experience I have had a lot of – in the past arrested a lot of people that had pill bottles in the floorboards that didn't have labels on them and that had different medication in it that didn't belong in the prescription, in the bottle, that didn't come with the bottle and things of that nature

*Tr.* 26:24-15; 27:1-7.

[5]*Tr.* 5:14-22; 24: 18-22; 64:5.

[6]*Gov't Ex. 2*; *Tr.* 28: 13-22;

[7]*Tr.* 31: 16-25; 32: 1-4.

3

seizure at issue.[8]

> Q: What contact did you have with Ms. Hogan?
>
> A. When I asked Ms. Hogan to exit the vehicle I asked them was there any weapons in the vehicle.
>
> Q. And what was the response?
>
> A. She told me she had a gun in her purse, in her hand bag.
>
> Q. And why did you ask her if there were any guns in the vehicle?
>
> A. That's a routine -- excuse me, that's a routine to ask people for weapons for our safety out there when we stop cars.
>
> Q. How long did this event take place up until the time that you asked were any vehicles -- were any weapons in the vehicle?
>
> A. Approximately about five to six minutes.

Sgt. Bailey was "standing on the passenger side door" when he asked Hogan to exit, and he described her response as follows:

> A: She got out and got this big, long pocketbook, it was a big purse, blue jean-type purse, and got out of the car.
>
> Q: And had you seen that pocketbook in the car prior to her getting out of the car?
>
> A: Yes, ma'am. It was sitting between her legs on the front seat. *** it was

---

[8]Acknowledging her lack of specific recall of the details for this nearly two-year old incident, Saylor provided no credible testimony in conflict with the officer's recollection on material points. She confirmed, for example, the absence of any officer-passenger interaction prior to her signing of the consent form: "After I signed the piece of paper he went around beside the car – went around the side of the car and told her to step out of the car. And she come to the back of the car. If I am not mistaken." (*Tr.* 65).

sitting on the floor. She didn't have it in her hand, it was just sitting in the floor. It was kind of a tall purse.[9]

Once outside, Hogan "stood close to the vehicle . ... Just behind the passenger rear door, back door", sufficiently close to touch the vehicle with her hands. Sgt. Bailey took the purse from her, placed it on the trunk of the car, and engaged the defendant as indicated in the following testimony:

Q: Okay. When you then placed that purse on the trunk what did you next do?

A: I asked Ms. Whaley – Ms. Hogan was there any weapons in the thing, in her purse, on her person or anything. And she volunteered.

Q: Why did you ask her if there was anything in the purse?

A: Because for my safety, and because of the size of the purse of the pocketbook that she had.

Sgt. Bailey "retrieved the weapon out of the pocketbook and unloaded it."[10] He then contacted Hogan's probation officer, Demetrious Dowdell, and detained Hogan until his arrival in "about two minutes [since] he was right across the street next to the police department."[11] Dowdell effected Hogan's arrest for the probation violation and transported her to the Chambers County jail.[12]

---

[9]*Tr.* 30-31.

[10]*Tr.* 34-35.

[11]*Tr.* 13: 22-25.

[12]*Tr.* 9-10. The car was not searched and the pill bottles not examined until probation officer Dowdell arrived; the attendant facts are omitted as they have no relevance
(continued...)

Later in the day Sgt. Bailey summoned Hogan at the Chambers County Detention Facility and interviewed her after she waived the Miranda rights he read to her, advising him that she understood those rights. Hogan then "stated that she had the gun inside of her blue jean pocketbook, that it belonged to her brother and she had it for herself, personal protection because she lived by herself."[13]

## II. DISCUSSION

Hogan challenges the legality of (a) Sgt. Bailey's seizure from her purse of the gun she reported that it contained, and (b) the inculpatory statement she made to Sgt. Bailey at police headquarters following her arrest and execution of a *Miranda* waiver of rights.[14] Hogan failed to offer any probative evidentiary support for the *Miranda* claim,[15] and the court finds no credible evidence

---

[12](...continued)
to the subjects of Hogan's suppression motion.

[13] *Tr.* 11-13; Ex. 3 .

[14] After retrieving the loaded weapon from Hogan's purse, Sgt. Bailey "asked her did she purchase any pills from Ms. Saylor, using any pills that belonged to Ms. Saylor." Hogan replied in the negative. (*Tr.* 38). To the extent that Hogan's *Miranda* claim incorporates this oral statement, it triggers no analysis as it failed to incriminate her at all.

[15] Defense Counsel made a valiant, albeit unsuccessful, effort to establish evidence that an impermissibly coercive atmosphere tainted Hogan's *Miranda* waiver. Under cross-examination Sgt. Bailey confirmed that Hogan was in jail clothing and brought by a jail guard to a multi-purpose room to be interviewed alone by him. He denied any coercive promises or threats to secure her inculpatory statement (*see Tr.* 52-56). Counsel's post-testimony arguments did not reference the *Miranda* claim (*see Tr.* 70-72). In sum, the record presents no analytical basis for any conclusion other than that Hogan made a knowing, voluntary and intelligent waiver of her rights under *Miranda v. Arizona*, 384 U.S. 436, 467-72 (1966). *See Colorado v. Connelly,* 479 U.S. 157, 167 (1986) ( [C]oercive police activity is
(continued...)

to undermine the voluntariness and integrity of the Waiver of Rights executed by Hogan prior to her custodial interview by Sgt. Bailey.[16] Accordingly, the claim requires no discussion. As now explained, the evidentiary record clearly and compellingly establishes that Hogan's Fourth Amendment claim also lacks merit.

Hogan's brief and counsel's examinations at the evidentiary hearing challenge the need for Sgt. Bailey to open and remove from Hogan's purse the gun she acknowledged having inside; counsel's closing argument, summarized below in pertinent part, crystallizes the contention:

> Your Honor, the issue that we presented in this Motion to Suppress specifically relates to whether or not this officer had basis for searching that purse. First the consent itself. Obviously the consent to search signed by Ms. Saylor under the law can not give him legal authority for searching a passenger's purse. . . In addition, he had the purse completely in his control. And he has made it clear in his testimony today that at the point where he searched the purse and was inquiring bout its contents, he already had it secured. He had no probable cause. He certainly had no warrant for searching the purse. He had no basis for a concern for the officer safety at that point, because he had removed Ms. Hogan from the car and he had separately removed the purse from her and secured the purse in his own possession. So at that point he should have no concern about officer safety.

This contention warrants short shrift. The United States advances a single justification for

---

[15](...continued)
a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause."); *Smith v. Zant*, 887 F.2d 1407, 1430 (11th Cir. 1989).

[16]*See* Waiver of Rights (*Gov't Ex.* 3) and Voluntary Statement (*Gov't Ex.* 4). Sgt. Bailey admitted his purpose in interviewing Hogan after her arrest by her state probation officer – to establish the basis for any federal criminal prosecution for being a convicted felon in possession of a gun – and he also testified that he related that purpose to Hogan before securing any *Miranda* waiver. *Tr.* 54.

7

the challenged seizure – the officer's safety – and it is adequate:[17]   Alone on a traffic stop involving a driver and a passenger, Sgt. Bailey observed the driver exit the vehicle without a purse and, in response to his query, she denied having any weapons on her person or in the car.[18]  After getting the driver's consent to search the vehicle and ordering the passenger to exit,[19] he saw her emerge with an over-sized purse and acknowledge readily that the purse contained a gun.  The law did not require him to enhance his exposure to danger by not securing the weapon and instead, simply holding onto the purse or leaving it on top of the trunk, thereby providing the opportunity for either or both of the un-handcuffed women to overcome him and secure the gun.  Instead, Sgt. Bailey had a reasonable

---

[17]Government counsel argued, in relevant part:

> Clearly both witnesses who have testified said that he got consent to search the vehicle before he got the purse. . . So, then we go to the purse, and at that point he is trying to, as he testified, protect his safety by determining if there's any weapon. . . .  I am going to tie this together with her comment about Ms. Saylor's purse – he said he wasn't concerned about Ms. Saylor's purse – . . . Well, Officer Bailey testified she didn't take that our of the car with her. *** Well, if [Ms. Hogan] had left [her purse] in the car like Ms. Saylor did, I will submit to the Court it would have been a different story.  But once she had that purse with her and within reach of her, he was justified in making sure that he was protected.  When she told him there was a gun in it, he was justified in removing that firearm.

*Tr.* at 73-74.

[18]Acknowledging on cross-examination that he did not examine the driver's purse until after the probation officer arrived at the scene and arrested the passenger, Sgt. Bailey explained: "[S]he didn't get out of the car with her purse like Ms. Hogan did." *Tr.* 50:1-2.

[19]Because police officers face an "inordinate risk" of assault incident to a lawful traffic stop, the United States has confirmed officers' authority within the Fourth Amendment to order both drivers and passengers to exit the vehicle. *See Pennsylvania v. Mimms*, 434 U.S. 106, 110-111 (1977) and *Maryland v. Wilson*, 519 U.S. 408, 413-415 (1997).

8

basis for inquiring if Hogan's purse contained any weapons,[20] and his legal authority to make such an inquiry is well-established. *See Terry v. Ohio*, 392 U.S. 1, 30 (1968) (discussing circumstances under which a police officer "is entitled for the protection of himself and others in the area to conduct a carefully limited search . . . in an attempt to discovery weapons which might be used to assault him"); *Adams v. Williams*, 407 U.S. 143, 145-46 (1972) (explaining that a "limited" weapons

---

[20]His cross-examination testimony, as follows, underscores the relevant evidence:

> Q: Okay. Now, am I correct that when Ms. Hogan got out you took the purse from her and placed it on the car?
>
> A: Yes, ma'am.
>
> Q: Okay. And where did you place the purse?
>
> A: On the trunk of the car.
>
> Q: Okay. And Ms. Hogan was not next to the trunk, she was next to the rear door?
>
> A: No, ma'am, she was next to the trunk just behind the rear door of the car.
>
> \*\*\*
>
> Q: Okay. When you then placed that purse on the trunk what did you next do?
>
> A: I asked Ms. Whaley – Ms. Hogan was there any weapons in the thing, in her purse, on her person or anything. And she volunteered.
>
> Q: Why did you ask her if there was anything in the purse?
>
> A: Because for my safety, and because of the size of the purse or the pocketbook that she had.

*Tr.* 33-34.

search is "not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence"); *United States v. Boyce*, 351 F.3d 1102, 1106 (11th Cir. 2003) *United States v. Purcell*, 236 F.3d 1274, 1280 (11th Cir. 2001) (finding that reasonable safety concerns justified officer's inquiry if motorist stopped for traffic violation had "any narcotics, weapons, contraband, anything like that in the car").

Sgt. Bailey had a basis for opening Hogan's purse and seizing the weapon inside not only for his own safety but also because of his awareness that the weapon in Hogan's possession represented contraband. See *Horton v. California*, 496 U.S. 128, 136, 137 (1990) (the contraband or otherwise incriminating nature of the seized item must be apparent immediately)*; United States v. Rodgers*, 924 F.2d 219, 222-23 (11th Cir. 1991) (incriminating nature of gun immediately apparent because officer knew defendant was convicted felon).

### III.  CONCLUSION

Pursuant to the stated findings and conclusions, it is the **RECOMMENDATION OF THE MAGISTRATE JUDGE that Defendant Hogan's' suppression motion (Doc. 14 ) be DENIED.**

It is further ORDERED that the parties shall file any objections to the said Recommendation not later than September 14, 2006. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and advisements in the Magistrate Judge's Recommendation shall bar the party from a de novo determination by the District Court of

issues covered in the Recommendation and shall bar the party from attacking on appeal factual findings in the Recommendation accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982). *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Done this 1st day of September, 2006.

                                        **/s/ Delores R. Boyd**
                                        DELORES R. BOYD
                                        UNITED STATES MAGISTRATE JUDGE